AMOCO PRODUCTION COMPANY,
Plaintiff,

v.

Sylvia V. BACA, et. al., Defendants.

Vastar Resources, Inc. and Atlantic
Richfield Company, Plaintiffs,

v.

Sylvia V. Baca, et. al., Defendants.

Nos. CIV.A. 00–02933(WBB),
CIV.A. 00–01480(WBB).

United States District Court,
District of Columbia.

Nov. 14, 2003.

Steven R. Hunsicker, Melissa Elaine Maxwell, Baker Botts, LLP, Washington, DC, for Plaintiffs.

Martin J. Lalonde, United States Department of Justice, Environment and Natural Resources, Washington, DC, for Defendants.

Harry Rubenstein Sachse, Sonosky, Chambers, Sachse, Endreson & Perry, Washington, DC, for Movant.

## MEMORANDUM

BRYANT, Senior District Judge.

Plaintiffs, Amoco Production Company ("Amoco") and Atlantic Richfield Company

and Vastar Resources ("ARCO/Vastar"), individually filed complaints seeking a declaratory judgment and injunction against Defendants, the United States Department of the Interior ("DOI"), its Secretary Bruce Babbit, and its Assistant Secretary Sylvia Baca.[1] Plaintiffs seek to enjoin DOI decisions relating to the determination of royalties due on the production of coalbed methane gas produced by Plaintiffs from certain federal leases.

Currently before the Court are the parties' Motions for Summary Judgment. Plaintiffs ask the Court to declare the DOI decisions invalid and unlawful and to enjoin the DOI from implementing or enforcing its decisions. Defendants oppose Plaintiffs' motions and argue that they are entitled to judgment as a matter of law. Also before the Court is an amicus brief filed by the Southern Ute Indian Tribe ("Tribe") in support of Defendants.

## BACKGROUND

Plaintiffs, Amoco and ARCO/Vastar produce coalbed methane gas as lessees under federal oil and gas mineral leases in the San Juan Basin of northwestern New Mexico. The Minerals Leasing Act ("MLA") governs the terms of federal oil and gas leases, including the leases involved in this case. 30 U.S.C. §§ 181–287 (2003). The MLA was intended by Congress to "promote wise development of [ ] natural resources and to obtain for the public a reasonable financial return on assets that 'belong' to the public." *California Co. v. Udall*, 296 F.2d 384, 388 (D.C.Cir.1961). In return for the privilege of producing coalbed methane gas on federal land, the MLA requires lessees to pay royalties based on the value of the production.

Coalbed methane gas, such as that produced by Plaintiffs, differs from conventional natural gas in that it contains significantly higher levels of carbon dioxide ($CO_2$). $CO_2$ reduces the value per unit of volume of natural gas because it has no energy value. As a result, $CO_2$ is generally removed from the gas after it is extracted and gas transportation pipelines typically have quality specifications limiting the amount of $CO_2$ allowed in the gas stream. In some instances, $CO_2$ is recovered after removal and sold as a separate product, however that is not the case here.

On April 22, 1996, the Associate Director for Royalty Management, MMS, issued a letter to producers of coalbed methane gas ("Dear Operator Letter") containing guidelines for calculating the proper payment of royalties and correct reporting of production. The letter responded to questions received by MMS from producers operating in the vicinity of New Mexico's San Juan Basin, a group of producers that includes Plaintiffs. The guidelines contained in the Dear Operator Letter apply specifically to circumstances in which $CO_2$ is removed from coalbed methane gas and vented into the air rather than being processed and sold as a separate product.

The Dear Operator Letter echoed internal guidelines contained in a December 7, 1995 MMS memorandum ("December Memorandum") that also addressed the valuation of coalbed methane gas production. The December Memorandum in turn was issued following a November 2, 1995 meeting of the MMS Royalty Policy Board during which interested parties, including producers, offered alternative valuation and reporting methods for coalbed methane. The valuation policy set forth in the December Memorandum was a modified version of that presented by the MMS and

---

1. After taking office, Secretary Gale Norton was substituted for Bruce Babbit and Assistant Secretary Wallace P. deWitt was substituted for Sylvia V. Baca.

**4**

the State of New Mexico during the November meeting.

On May 22, 1996; ARCO/Vastar appealed the guidelines contained in the Dear Operator Letter, but the appeal was returned because the letter itself was not a final decision of the MMS Director. MMS advised ARCO/Vastar that an appeal would be appropriate in the event lessees were ordered to take action to correct any noncompliance with the letter's guidelines. Subsequently, the State of New Mexico audited both Plaintiffs' production and royalty reporting and determined that, in fact, ARCO/Vastar and Amoco were not in compliance with the guidelines contained in the Dear Operator Letter. Based on the results of the New Mexico audit, the MMS issued the decision and orders that form the basis of Plaintiffs' Complaints.

### ARCO/Vastar's Complaint

ARCO/Vastar appeals the consolidated decision of Assistant Secretary Sylvia V. Baca issued on March 24, 2000 ("ARCO/Vastar Decision"), which largely affirmed two decisions of the MMS relating to the calculation of royalties due on the sale of coalbed methane gas produced from federal leases held by ARCO/Vastar. The first decision was an MMS order issued on January 22, 1997 ("January Order") finding that ARCO/Vastar incorrectly calculated the royalties due on sales between 1989 and 1996. Upon review of deductions allowable under applicable regulations and the guidelines contained in the December Memorandum, the MMS determined that ARCO/Vastar erroneously took deductions for certain transportation and processing costs related to the transportation and removal of $CO_2$. As a result, the January Order directed ARCO/Vastar to pay past due royalties of $782,373, to recalculate the royalties due on certain leases in the San Juan Basin during the audit period, and to pay any additional royalties found to be due. The January Order further stated that late payment interest would be calculated and assessed pursuant to 30 C.F.R. § 218.102 (1996) upon receipt of any additional royalties due.

The second decision addressed by the ARCO/Vastar Decision was a decision by the MMS Royalty Valuation Board ("RVD Decision") issued on July 14, 1997 which denied a request for an extraordinary processing cost allowance. ARCO/Vastar had requested approval for an extraordinary processing cost allowance for the costs of removing $CO_2$ from coalbed methane gas produced from a federal lease and treated at a particular treatment facility. Based on applicable regulations, the December Memorandum and the Dear Operator Letter, the Royalty Valuation Board rejected ARCO/Vastar's argument that the composition of the gas stream, plant design and associated costs justified the requested allowance.

Because the January Order and the RVD Decision raised overlapping issues related to the definition of marketable condition and extraordinary processing costs, the Assistant Secretary consolidated ARCO/Vastar's appeals of the two decisions. The ARCO/Vastar Decision largely upheld both the January Order and the RVD Decision and addressed four issues: (1) whether the cost of $CO_2$ removal is necessary to place the gas in marketable condition or allowable as an extraordinary processing cost allowance; (2) whether costs incurred to transport the coalbed methane gas are deductible; (3) whether the April 22, 1996 Dear Operator Letter violates the Administrative Procedure Act; and, (4) whether late payment interest is applicable to royalties deemed deficient for prior periods.

### Amoco's Complaint

Amoco appeals the Assistant Secretary's decision of September 12, 2000 ("Amoco Decision"), which denied (with slight modifications) Amoco's appeal of a May 27, 2000 MMS Order ("May Order") directing Amoco to pay additional royalties of $4,117,607, to conduct a restructured accounting of certain federal and Indian leases, and to pay any additional royalties found to be due. The Assistant Secretary addressed four issues in the Amoco Decision: (1) whether $CO_2$ removal is necessary to place the gas at issue in marketable condition; (2) whether the costs of transporting excess $CO_2$ is deductible when coalbed gas is treated away from the lease; (3) whether the April 22, 1996 Dear Operator Letter violates the Administrative Procedure Act; and, (4) whether MMS can collect royalties that become due more than six years before the date of the order to pay.

Since ARCO/Vastar and Amoco's appeals raise common issues their Motions for Summary Judgment were consolidated for briefing purposes. Plaintiffs argue that the guidelines contained in the Dear Operator Letter are invalid because the letter violates the Administrative Procedure Act. They further argue that $CO_2$ removal is not necessary to place coalbed methane gas in marketable condition and that they are entitled to transportation allowances for transporting $CO_2$ from the wellhead to treatment facilities where $CO_2$ is removed. Plaintiffs additionally assert separate claims. ARCO/Vastar argues that it is entitled to an allowance for extraordinary processing costs and that DOI improperly assessed late payment interest on overdue royalties. Amoco argues that the statute of limitations prohibits the collection of royalties after six years. The Court will first address Plaintiffs' common claims and then move to the individual claims.

## APPLICABLE LAW

### Summary Judgment Standard and Standard of Review

 Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c) (2003). The Court must set aside the Assistant Secretary's decisions under the Administrative Procedure Act ("APA") if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. 706(2)(A) (1996). When Congress has not spoken to the specific question at issue a court will defer to an agency's interpretation of a statute it is entrusted to administer so long as it reasonable and "is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Deference to the Assistant Secretary's decisions is appropriate in this case because Congress plainly delegated broad authority to the DOI " 'to prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the Minerals Leasing Act]' ... [which includes] collecting royalties and determining the methods by which they are calculated." *Independent Petroleum Ass'n of America v. DeWitt*, 279 F.3d 1036, 1039 (D.C.Cir.2002) ("*IPAA*") (quoting 30 U.S.C. § 189). Moreover, deference is regularly accorded to agency decisions relating to mineral leases and royalty valuations. *IPAA*, 279 F.3d at 1040 (citing numerous cases in which courts deferred to agency construction of royalty regula-

**6**

tions).[2]

### The Mineral Leasing Act, the Federal Oil and Gas Royalty Management Act and Related Regulations

The MLA invests the Secretary of the Department of the Interior with the authority to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of [the MLA]." 30 U.S.C. § 189 (1986). The Minerals Management Services ("MMS"), a division within the DOI, administers the MLA and manages royalty payments.

The Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA") was enacted by Congress upon finding that "the system of accounting with respect to royalties and other payments due and owing on oil and gas produced from such lease sites is archaic and inadequate." 30 U.S.C. § 1701(a)(2) (1986). The purpose of FOGRMA is to:

> clarify, reaffirm, expand, and define the responsibilities and obligations of lessees, operators, and other persons involved in transportation or sale of oil and gas from the Federal and Indian lands ... [and] to clarify, reaffirm, expand, and define the authorities and responsibilities of the Secretary of the Interior to implement and maintain a royalty management system for oil and gas leases on Federal lands ....

30 U.S.C. § 1701(b)(1), (2) (1986).

FOGRMA directs the Secretary of DOI to "audit and reconcile, to the extent practicable, all current and past lease accounts for leases of oil or gas and take appropriate actions to make additional collections or refunds as warranted." *Id.* at § 1711(c)(1) (1986). The Secretary may delegate all or part of this authority to a State upon written request. *See* 30 U.S.C. § 1735(a) (2003).

As noted previously, the MLA requires federal lessees to pay royalties in return for the privilege of mining federal lands. The calculation of royalties is governed by a labyrinth of interrelated statutes and regulations. The MLA requires lessees to pay a royalty "at a rate of not less than 12½ % in amount or value of the production removed or sold from the lease." 30 U.S.C. § 226(b)(1)(A) (2003). The "value of production" is defined by the so-called "gross proceeds" rule which provides that, for royalty purposes, the value of production shall under no circumstances be less than the gross proceeds earned by the lessee, minus certain allowances for transportation and processing. 30 C.F.R. § 206.153(h) (2002); 30 C.F.R. § 206.157(a) (2002); 30 C.F.R. § 206.158 (2002). "Production," as that term is used in the phrase "value of production," is production in marketable condition. *California Co.*, 296 F.2d at 388.

The availability of transportation and processing allowances implicitly recognizes that the government should share in certain costs of production. However, lessees are required to assume the entire cost of placing gas in "marketable condition" and

---

**2.** As this Circuit has noted, arbitrary and capricious review under the APA and the *Chevron* deference standard of review "overlap at the margins." *Independent Petroleum Assn'n of America v. Babbitt*, 92 F.3d 1248, 1258 (D.C.Cir.1996) ("*Babbitt*"); *Arent v. Shalala*, 70 F.3d 610, 615 (D.C.Cir.1995); *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 728 (D.C.Cir.1994). The heart of the matter in this case is whether the Assistant Secretary's decisions interpreting royalty valuation statutes and regulations were reasonable and consistent with the purpose of the Mineral Leasing Act. Understanding that an unreasonable interpretation is functionally equivalent to an arbitrary or capricious interpretation, analytically, the Court will apply the *Chevron* deference standard of review.

marketing the gas for the mutual benefit of the government and lessee. 30 C.F.R. § 206.153(i) (2002). "Marketable condition" is a term of art defined for purposes of valuation as "lease products which are sufficiently free from impurities and otherwise in a condition that they will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 206.151 (2002). By definition then, "marketable condition" is a fluid concept, wholly dependent on the particular facts of each case.

The marketable condition rule is pivotal in the calculation of royalties because it affects the determination of a lessee's gross proceeds, and therefore the value of production. When value "is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the residue gas or gas plant products in marketable condition or to market the residue gas and gas plant products." 30 C.F.R. § 206.153(i). In other words, royalties are due on the value of the gas in a certain condition-marketable condition-whether or not the producer pays the necessary conditioning costs directly or indirectly. The $64,000 question in this case is identifying what condition is "marketable condition" with respect to the gas produced by Plaintiffs.

## DISCUSSION

### The Payor Letter Does Not Violate the Administrative Procedure Act

Plaintiffs argue that the DOI applied the Dear Operator Letter of April 22, 1996 as an agency rule in violation of the APA. For purposes of the APA, a rule is defined as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4) (1991). Agency rules are subject to notice and comment, meaning that an agency must publish a proposed rule in the Federal Register and allow interested parties sufficient time to submit comments. 5 U.S.C. § 553 (1996). Interpretive rules, general statements of policy and rules of agency organization, procedure or practice are exempt from notice and comment procedures. See id. at § 553(b)(3)(A). An agency rule issued without notice and comment will be set aside as unlawful unless it falls within one of the three exceptions. 5 U.S.C. § 706(2)(D) (1996).

In both the ARCO/Vastar Decision and the Amoco Decision, the Assistant Secretary determined that the Dear Operator Letter is an interpretation of existing regulations and that the procedural requirements of the APA were therefore inapplicable. See ARCO/Vastar Decision at 19; Amoco Decision at 20 (citing Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995)). She further found that the MMS properly applied the valuation regulations as explained by the Dear Operator Letter and noted that the decisions of March 24, 2000 (ARCO/Vastar Decision) and September 12, 2000 (Amoco Decision) modified any inconsistencies between the MMS decision and the regulations that may have existed

Plaintiffs argue that the Assistant Secretary erred and that the Dear Operator Letter is a substantive rule which must be set aside because it was never subject to notice and comment. Alternatively, Plaintiffs argue that even if the Dear Operator Letter is not a substantive rule, i.e., it falls within one of the APA's three exceptions, notice and comment was nonetheless required because the Letter effected a

change in existing law or policy. Defendants counter that the Dear Operator Letter was not subject to notice and comment because it is not binding on the agency and because it did not introduce a significant change in existing law.

In circumstances substantially similar to the instant case, this Circuit held that an interpretive letter issued by the MMS did not constitute a rule and was therefore not subject to notice and comment. *Babbitt*, 92 F.3d at 1256–57. In *Babbitt*, the Associate Director of Royalty Management, MMS, issued a letter clarifying its treatment of settlement payments. It was part of a series of adjustments made by MMS in the face of fundamental changes in the structure of the natural gas industry and subsequent judicial decisions interpreting legislative intent and agency action. Specifically, the letter at issue in *Babbitt* related to the determination of royalties due on settlement payments made by pipeline purchasers of natural gas to lessees in return for contract amendments or buyouts. The District Court held, and the Court of Appeals affirmed, that the letter itself did not constitute a rulemaking because "nothing in the DOI's procedures vests authority in the Associate Director of the MMS [the letter's author], or even the Director, to issue proclamations binding on the agency ... [q]uite simply, the May 1993 letter is not an 'agency statement' with 'future effect' since it did not bind the agency in any way." *Babbitt*, 92 F.3d at 1256 (affirming the District Court's unpublished decision in *Independent Petroleum Ass'n of America v. Babbitt*, 1995 WL 431305 at *4 (D.D.C. June 14, 1995)).

■ The Dear Operator Letter at issue in this case was likewise issued by the Associate Director for Royalty Manage-

ment, MMS, and therefore for the same reasons, it can no more bind the agency than the letter at issue in *Babbitt*. To the extent that the ARCO/Vastar Decision and the Amoco Decision conflict with the above analysis, they are overturned. Nevertheless, the outcome is the same; the Court will not set aside the Dear Operator Letter because it is not a rule and it was therefore not subject to notice and comment.

### Plaintiffs' Coalbed Methane Gas Is Not in Marketable Condition at the Wellhead

In their respective appeals to the Assistant Secretary, ARCO/Vastar and Amoco each asserted that the marketable condition rule only requires lessees to place gas in the physical condition necessary to market it under contracts typical for the field or area immediately surrounding the wellhead. Plaintiffs argued that their gas is in marketable condition in its natural state because it can be sold at the wellhead, and therefore they are not required to condition gas for downstream markets. Plaintiffs additionally argued that the MMS's requirement of conditioning gas to the interstate pipeline standard of 2% $CO_2$ was arbitrary and capricious. The Assistant Secretary flatly rejected both arguments.

Though the Assistant Secretary's Decisions are somewhat circuitous, the underlying rational is sound. After reviewing Plaintiffs' gas sales, she found that most of the gas produced by Plaintiffs from the field or area was conditioned to reduce the level of $CO_2$ because it was sold for use in distant markets.[3] This was true, the Assistant Secretary noted, whether gas was purchased at the wellhead in its natural state and subsequently conditioned by the

---

**3.** The Assistant Secretary noted that only about 10% of the production from the area was utilized in its untreated form. *See* Amoco Decision at 7–8, n. 11; ARCO/Vastar Decision at 5, n. 7 and 7, n. 9.

purchaser, or purchased· at the tailgate of a treatment plant after conditioning. The Assistant Secretary further noted that the purchase price of gas purchased at the wellhead in its natural condition was reduced to offset costs incurred by the purchasers to transport and condition gas to remove $CO_2$. In other words, the Assistant Secretary determined, contracts typical for the field or area involve gas with reduced $CO_2$ levels, whether the gas is purchased in that condition or whether purchasers perform the conditioning themselves in return for a reduced price, i.e., "[t]he fact that some purchasers are willing to purchase gas prior to conditioning and perform the conditioning themselves does not alter the finding that the gas needs to be conditioned." *See* ARCO/Vastar Decision at 5; Amoco Decision at 9. The Assistant Secretary concluded therefore that gas from the area must have a reduced level of $CO_2$ to be in marketable condition, and that producers cannot "alter the form of their sales arrangements in order to force the lessor to share in [their] costs to place the product in marketable condition." *See id.* Finally, based on her observation that most of the coalbed methane gas produced by Plaintiffs was sold for use outside the area of production, the Assistant Secretary agreed with MMS that the pipeline standards for $CO_2$ content effectively established the marketable condition standard.[4]

In the instant appeal, Plaintiffs again argue that gas is in marketable condition at the wellhead in its natural state and that the Assistant Secretary erred in finding otherwise. First, to be clear, Plaintiffs do not question the fact that they must bear the cost of placing the gas in market-

able condition. Rather, they argue that the gas at issue is in marketable condition at the wellhead in its natural state as evidenced by the existence· of wellhead sales. In other words, Plaintiffs would have the Court hold that the simple fact that gas can be sold at the wellhead demonstrates that it is in marketable condition. Defendants argue ·that the existence of wellhead sales is not determinative of whether gas is in marketable condition. Both parties rely upon *California Co.* for support of their position.

■ *California Co.* holds that ·the marketable condition rule requires the lessees to pay royalties on the costs of placing gas in marketable condition. *California Co.,*. 296 F.2d at 388. Calco, a lessee producing oil and gas on federal leases, executed a contract under which it agreed to sell gas "in its natural state suitable for pipeline transmission" at a particular price. *California Co.,* 296 F.2d at 386. Although some of the· gas produced by Calco met pipeline requirements in its natural state, some gas required compression or other conditioning to meet the pipeline requirements. *See id.* Calco acknowledged its obligation to market gas removed from the lease, but claimed that it was required to pay royalties only on the price of the gas minus the cost of conditioning. *See id.* at 386–87. Stated another way, Calco argued that it was not required to pay royalties on the cost of conditioning the gas. The Department of Interior thought otherwise. *See id.* at 387. ·

As described *infra,* the royalty valuation statute requires lessees to pay a royalty of 12½ % of the value of production removed or sold from the lease. 30 U.S.C.

---

4. The Assistant Secretary modified the ARCO/Vastar January Order and the Amoco May 27, 1997 Order to the extent that they directed Plaintiffs to recalculate royalties us-

ing pipeline quality standards that allowed variable amounts of $CO_2$ (1–3%) in the gas stream.

§ 226(b)(1)(A).[5] In reviewing the agency's decision in *California Co.*, the Court of Appeals focused on the phrase "value of production" and asked whether "production" refers to the raw product regardless of its condition, or the product conditioned for the market in which it is being sold. *California Co.*, 296 F.2d at 387. The Secretary of the Department of Interior construed "production" as meaning gas conditioned for market because lessees were obliged to market the product at no cost to the government. *See id.* at 388. Ultimately, the Court of Appeals for the District of Columbia Circuit agreed, and as a result, Calco was required to pay royalties on the costs of conditioning the gas. The Court of Appeals prefaced their conclusion with a particularly salient observation:

> [t]heoretically, any gas—any "production"—is "marketable." We can assume that, if the price were low enough to justify capital expenditures for conditioning equipment, someone would undertake to buy [gas in its natural condition]. A lessee who sold unconditioned gas at such a price would, in a rhetorical sense, be fulfilling his obligation to "market" the gas, and by thus saving on overhead he might find such business profitable. There is a clear difference between "marketing" and merely selling. For the former there must be a market, an established demand for an identified product. We suppose almost anything can be sold, if the price is no consideration. In the record before us there is no evidence of a market for the gas in the condition as it comes from the wells.

*Id.* at 387–88.

The distinction between "marketing" and merely "selling" is especially relevant given the facts of this case and the analysis underlying the Assistant Secretary's conclusion that the market for the gas at issue was for gas with reduced levels of $CO_2$. Based on typical sales contracts for the gas at issue, the Assistant Secretary determined that there was a very limited market for gas in its natural condition, which market consisted of a small local community capable of utilizing gas in spite of high levels of $CO_2$. The typical sales contract for gas produced in the area was one in which purchasers demanded gas suitable for the actual market which was distant from the production area. Thus, the actual market was for gas having low levels of $CO_2$, whether purchasers bought the gas at a reduced price and conditioned it themselves, or whether they purchased the gas at the tailgate of a treatment plant after conditioning.

The cases cited by Plaintiffs are consistent with the holding of *California Co.* and provide no support for their position. In *Xeno, Inc.*, 134 I.B.L.A. 172 (1995), plaintiff, Xeno, together with other lessees from the same producing area, formed a joint venture to purchase gas at the wellheads and resell it to a third party after gathering and compression. *Xeno*, 134 I.B.L.A. at 173–4. Xeno paid royalties on the gross proceeds it received from the joint venture. *See id.* at 174. The State of Montana reviewed Xeno's royalty payments and determined that Xeno improperly deducted gathering and compression charges from its gross proceeds because it had valued lease production on the gross proceeds received from sales to the affiliated joint venture rather than the value established by the arms-length agreement between the affiliated joint venture and the third party. *See id.* The agency agreed with the State of Montana's audit and assessed additional royalties. *See id.* Given the circumstances surrounding the joint

---

**5.** Though the statute has been amended since *California Co.* was decided, the substance of this particular provision has remained unchanged.

venture's formation, the agency presumed that the sole purpose of the affiliated joint venture was to relieve Xeno and the other producers of the cost of gathering and compressing the gas, thereby reducing the amount of gross proceeds against which royalties would be collected. *See id.* at 175. The agency explained that the producers could not reduce the value of the gas for royalty purposes by gathering and compression costs that were necessary to put the gas in marketable condition, regardless of whether the gathering and compression was performed before or after being sold to the joint venture. *See id.*

Upon review, the administrative judge determined that the MMS incorrectly determined that gathering and compression were necessary *per se* to place the gas in marketable condition. *Xeno*, 134 I.B.L.A. at 182. The administrative judge found no evidence in the record of any analysis by the MMS of what constituted marketable condition for the gas at issue. *See id.* This was in stark contrast to substantial evidence provided by Xeno of competing offers from firms other than the affiliated joint venture to purchase gas at the wellhead prior to gathering or compression for similar or higher prices. *See id.* at 182–83. Thus, "unlike the record in *California Co.* there [was] evidence of a market for the gas at the wellhead." *Id.* at 183. The existence of competing offers to buy gas at the wellhead indicated that there was in fact a market for the gas at the wellhead in its natural condition and that gathering and compression were not necessary to place the gas in marketable condition. Therefore the gathering and compression costs were properly excluded from Xeno's royalty calculation. *See id.*

The Tenth Circuit approved the rationale of *Xeno* in *Amerada Hess Corp. v. Dept. of Interior*, 170 F.3d 1032 (10th Cir.), though the outcome was not the same.

The issue in *Amerada Hess* was whether royalties were owed on reimbursements received by the producers for certain production-related costs. *Amerada Hess*, 170 F.3d at 1036. The court ultimately held that royalty was owed on such costs. However in arriving at its conclusion the court distinguished the case from *Xeno*, stating that "*Xeno* reached a different result because the producer company in that case showed that its gas was in marketable condition and could be sold directly from the wellhead ... [plaintiff] has made no such showing here, and therefore cannot benefit from the DOI's ruling in *Xeno*." *See id.* at 1037.

Plaintiffs additionally rely upon *Beartooth Oil and Gas Co. v. Lujan*, No. 92–99 (D.Mont. Sept. 22, 1993) (vacating and remanding *Beartooth Oil and Gas Co.*, 122 I.B.L.A. 267 (1992)). In *Beartooth*, the plaintiff, Beartooth, sold gas at the wellhead to Mesa, which in turn sold the gas to Mountain Fuel. *Beartooth*, slip op. at 2. None of the companies were affiliated and each of the sales agreements were arms length. *See id.* The price Mesa paid Beartooth (and on which Beartooth paid royalties) was based on the price Mesa received from Mountain Fuel, reduced by certain factors including the cost of compression for delivery to Mountain Fuel. Beartooth appealed the agency's order demanding royalties for the amount the Mesa/Mountain Fuel price was reduced for compression costs. *Beartooth*, slip op. at 2–3.

The court vacated and remanded the agency's decision because the agency failed to determine what constituted "marketable condition" for the gas at issue. The court found that the MMS acted arbitrarily and capriciously because it did not consider whether or not the contract for sales of the gas at issue was "typical for the field." *Beartooth*, slip op. at 4. Rather, as it did in

*Xeno*, MMS assumed that gas was not in marketable condition unless it was compressed. *See id.* at 5. The Court recognized in *Beartooth* that:

> Mesa may or may not be performing conditioning necessary to place Beartooth's gas into 'marketable condition.' However, until the IBLA first establishes what specifically constitutes 'marketable condition' for gas produced from the lease, it is arbitrary and capricious to conclude the gas as sold to Mesa was not in marketable condition.

*Id.* at 10.

Plaintiffs argue that the foregoing cases stand for the premise that gas is in marketable condition at the wellhead simply because it is sold at the wellhead. However, this construction is too narrow. In both *Xeno* and *Beartooth*, the agency's determination that gas was not in marketable condition at the wellhead was overturned because the agency failed to determine what constituted marketable condition under the particular circumstances of the case-not because the gas was in marketable condition at the wellhead. The existence of wellhead sales are one factor to consider in identifying marketable condition, but it is not the determinative factor, in part because it overlooks the plain language of the applicable regulations.

The marketable condition rule anticipates and prohibits the type of arrangements alluded to in *California Co.* and which the agency mistakenly assumed existed in *Xeno*, wherein producers offer reduced prices to purchasers who in turn incur the costs of placing gas in marketable condition. Specifically, the rule requires lessees to

> place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government. Where the value established under this section is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the gas in marketable condition or to market the gas.

30 C.F.R. § 206.152(i) (2002).

The Court's role is to decide whether the agency's interpretation and application of the "marketable condition" rule in this case is reasonable. After reviewing the evidence presented by the parties and the marketable condition rule, the Assistant Secretary determined that in this case, the gas at issue is not marketable unless it has reduced levels of $CO_2$. Since lessees must bear the cost of placing gas in marketable condition, it makes no difference whether purchasers buy the gas at the wellhead for a reduced price or at the tailgate of a treatment plant after conditioning. The Court finds that, under the particular circumstances in this case, the Assistant Secretary's decision is a reasonable application of the marketable condition rule. Therefore, Plaintiffs must pay royalties on the cost of conditioning the gas to reduce $CO_2$ levels.

### Limitations on Transportation Allowances Are Appropriate

Though lessees are required to place gas in marketable condition at no cost to the government, they are permitted to deduct from the value of production certain reasonable and actual transportation costs. 30 C.F.R. § 206.156 (2002). Plaintiffs argue that the Assistant Secretary's determination that transportation costs for $CO_2$ levels in excess of pipeline quality standards are not deductible is in error because the transportation and removal of

$CO_2$ is "directly related" to transportation of lease production.

As discussed *infra*, the gas at issue must have a reduced level of $CO_2$ to be in marketable condition; therefore, lessees bear the costs associated with removing excess $CO_2$. The Assistant Secretary observed that "transportation of the $CO_2$ to the treatment plant in this instance is a service that is inextricably tied to placing the gas in marketable condition because the $CO_2$ is extracted at the plant." ARCO/Vastar Decision at 15. She reasoned that the cost of transporting excess $CO_2$ from the wellhead to the conditioning facility was a marketing cost and could not be deducted as transportation costs.[6] As a result, the cost of transporting coalbed methane and 2% $CO_2$ from the wellhead to the conditioning plant was permitted as a transportation allowance and cost of transporting excess $CO_2$ was not.

█ The cases upon which Plaintiffs rely for their position are readily distinguishable from the facts of this case. *Marathon Oil Co. v. United States*, 604 F.Supp. 1375, 1378 (D.Alaska 1985), stemmed from a controversy between a lessee and MMS involving the proper method of valuing natural gas at the wellhead for royalty purposes. The marketable condition rule was not a factor in the court's finding that the costs of liquefying natural gas were incurred to facilitate transportation. *Marathon*, 604 F.Supp. at 1385–87. Similarly, in *Exxon Corp.*, 118 I.B.L.A. 221 (1991), the Interior Board of Land Appeals determined that dehydration of the gas at issue was not necessary to satisfy market specifications but rather was performed for the sole purpose of

facilitating transportation. *Exxon Corp.*, 118 I.B.L.A. at 241. In contrast, $CO_2$ removal is essential in the instant case to place gas in marketable condition. That there exists a corollary benefit in reducing the level of $CO_2$ does not transform what is a marketing cost into a transportation cost. The Court therefore finds that the Assistant Secretary's application of the regulations relating to transportation allowances to the circumstances of this case is reasonable, and for that reason, Plaintiffs' appeal thereof is denied as to this issue.

### ARCO/Vastar Is Not Entitled to an Extraordinary Processing Allowance

As described *infra*, lessees pay royalties on the value of production removed or sold from the lease. "Value of production" is defined by regulations promulgated by MMS and includes allowances that permit lessees to deduct certain transportation and processing costs from the royalty value. Lessees may not take deductions for costs incurred to place production in marketable condition or for processing lease production which is not royalty bearing. 30 C.F.R. § 206.158(d)(1) (2002). Lessees may however apply to MMS for an allowance for extraordinary processing costs, i.e., those shown to be extraordinary, unusual or unconventional as compared to standard industry conditions and practice. 30 C.F.R. 206.158(d)(2)(i). Guidelines issued by MMS on March 19, 1996, set forth the following factors MMS considers in evaluating an application for extraordinary processing costs: (1) the composition of the gas stream being processed; (2) the complexity of the gas plant design compared to conventional or typical gas pro-

---

6. Plaintiffs additionally challenge the Assistant Secretary's alternative rationale which turned on whether excess $CO_2$ is properly identified as a "waste" product or a "nonroyalty" product. However, the Court need not address Plaintiffs' arguments on this issue since the Assistant Secretary's decision is affirmed on the grounds that marketing costs cannot be deducted as transportation costs.

cessing plants, as well as the methods used to process the gas to remove elements or compounds from the gas; and (3) the unit costs incurred to recover the principal product, usually methane. *See* ARCO/Vastar Administrative Record, tab 23–2, MMS Guidelines for Extraordinary Processing Cost Recovery, March 19, 1996 ("March 19 Guidelines").

On April 29, 1997, Vastar requested approval for an extraordinary cost allowance for the cost of removing $CO_2$ from its gas stream. The RVD Decision denied Vastar's application because MMS determined that Vastar did not "compellingly demonstrate that the resource, plant design or unit costs are extraordinary, unusual or unconventional" and because "[r]egulations at 30 C.F.R. § 206.158(d)(1)(1996) disqualify a processing allowance for this case." *See* RVD Decision at 1. Vastar appealed the RVD Decision to the Assistant Secretary who, after reviewing the decision and considering the parties' arguments, agreed that ARCO/Vastar was not entitled to an extraordinary processing allowance.

ARCO/Vastar appeals the Assistant Secretary's decision arguing that it is arbitrary and capricious. ARCO/Vastar asserts that the Assistant Secretary ignored the DOI's own precedent because it had previously approved an extraordinary processing allowance for the Louisiana Land and Exploration Company for costs incurred in removing $CO_2$. ARCO/Vastar additionally argues that an extraordinary processing cost allowance is permitted under the March 19 Guidelines when gas plant products (in this case, $CO_2$) are vented into the air rather than being sold as a separate product. Finally, ARCO/Vastar argues that coalbed methane gas as a product is eligible for an extraordinary cost allowance.

■ The ARCO/Vastar Decision is not arbitrary and capricious as the Assistant Secretary fully and carefully considered the prerequisites necessary for an extraordinary processing cost allowance before agreeing with MMS that ARCO/Vastar was ineligible. At the outset of the decision, the Assistant Secretary observed that ARCO/Vastar was not entitled to a processing allowance for the costs of $CO_2$ removal under 30 C.F.R. § 206.158(d)(1) because such conditioning was necessary to place the gas in marketable condition (a cost lessees must bear alone) and because the $CO_2$ was vented into the air rather than being captured and sold as a royalty bearing product. The Assistant Secretary then turned to the issue of whether $CO_2$ removal qualified as an extraordinary processing cost under 30 C.F.R. § 206.158(d)(2)(i) and the March 19 Guidelines.

The Assistant Secretary agreed with ARCO/Vastar that its gas is "atypical" due to the high $CO_2$ content, but stated that this determination alone was not dispositive, presumably because the design of the Val Verde plant and the process used to remove the $CO_2$ must also be considered. *See* ARCO/Vastar Decision at 12; *see also,* March 16 Guidelines. Though ARCO/Vastar attempted to distinguish the Val Verde plant from conventional plants by focusing on the type, concentration and amount of amine used and the amount of water required to remove $CO_2$ from the gas stream, the Assistant Secretary concluded that the use of amine in gas processing plants is common and the Val Verde plant itself was relatively simple compared to other conventional gas processing plants because its only function is to remove $CO_2$. *See id.* at 12. Finally, the Assistant Secretary was unable to evaluate whether ARCO/Vastar's costs were typical or extraordinary because ARCO/Vastar failed to provide standard industry costs for $CO_2$ removal. Rather it simply argued that its

cost of $0.0778 per Mcf to recover methane is "significant." *See id.* at 13.

ARCO/Vastar's argument that it is entitled to an extraordinary processing cost allowance because of the agency's decision regarding extraordinary processing cost allowances for Louisiana Land and Exploration Company ("LL & E") is entirely without merit. *See* ARCO/Vastar Administrative Record, tab 13–3, MMS letter to The Louisiana Land and Exploration Company, March 15, 1996 ("LL & E Letter"). First, the regulation requires lessees to apply to the MMS for an extraordinary processing cost allowance, which will be granted "only if the lessee can demonstrate that the costs are, by reference to standard industry conditions and practices, extraordinary, unusual, or unconventional." 30 C.F.R. § 206.158(d)(2)(i). In other words, extraordinary processing cost allowances are approved on a case by case basis and are necessarily dependent on the specific facts of each case.

Second, unlike ARCO/Vastar, LL & E demonstrated that not only its gas but also its plant design and costs were extraordinary, unusual or unconventional in comparison to standard industry conditions. LL & E's gas was atypical because it contained no natural gas liquids ("NGLs") and was comprised of 20% $CO_2$ and 12.6% hydrogen sulfide ($H_2S$). *See* LL & E Letter at 3. MMS noted that "[t]his gas is the only gas stream in the continental U.S. containing such high levels of both $CO_2$ and $H_2S$, with no NGLs."[7] *See id.* Further

ther complicating matters was the fact that the gas produced by LL & E was significantly hotter than conventional gas streams. *See id.* The MMS found that the high temperature of the LL & E gas combined with its highly acidic composition necessitated a unique and complex processing unit. *See id.* In contrast, the Assistant Secretary noted that the amine process used in the Val Verde plant is "quite common" and the plant itself is "composed of only one part of what is considered a fairly complex natural gas processing plant." *See* ARCO/Vastar Decision at 12. Finally, LL & E provided both its own processing costs and typical industry costs of processing acidic gas streams, enabling MMS to compare the two and determine that in fact LL & E's processing costs were extraordinary. *See id.* at 4. ARCO/Vastar did not provide standard industry costs for recovering methane, but rather expected the Assistant Secretary to rely on its assertion that its costs were "significant."

ARCO/Vastar's remaining arguments are merely unsupported assertions. ARCO/Vastar does not explain why the March 16, 1996 Guidelines would permit an extraordinary processing cost allowance when gas plant products such as $CO_2$ are vented into the air rather than being sold as a separate product. Nor does ARCO/Vastar describe why coalbed methane gas as a product is eligible for an extraordinary cost allowance.[8] As a result,

---

7. ARCO/Vastar argues that it is entitled to an extraordinary processing cost allowance because with respect to LL & E "the MMS relied on the absence of liquids in a gas stream for its finding that the gas was atypical and qualified for an extraordinary processing allowance." *See* Plaintiffs' Joint Memorandum of Points and Authorities in Support of Motions for Summary Judgment at 52. However, this is a misstatement as MMS plainly

did not rely solely on the fact that LL & E's gas contained no NGL's.

8. ARCO/Vastar consistently compares its gas to non-coalbed natural gas in order to justify an extraordinary processing allowance. However, MMS sensibly explained in the RVD Decision why such a comparison is inapplicable:

 [n]atural gas has diverse characteristics in terms of geologic setting, reservoir proper-

ARCO/Vastar's appeal is denied as to this issue.

### Late Payment Interest Is Due on Additional Royalties

In the January Order, MMS stated that late payment interest would be calculated and assessed upon receipt of payment of additional royalties. *See* January Order at 8. The Assistant Secretary sustained the assessment of late payment interest in the ARCO/Vastar Decision because she determined that it was supported by longstanding precedent. *See* ARCO/Vastar Decision at 19.

The government's right to interest on late royalty payments is statutorily recognized in FOGRMA, which states that:

in the case of oil and gas leases where royalty payments are not received by the Secretary on the date that such payments are due, or are less than the amount due, the Secretary shall charge interest on such late payments or underpayments at the rate applicable under section 6621 of Title 26. In the case of an underpayment or partial payment, interest shall be computed and charged any on the amount of the deficiency and not on the total amount due.

30 U.S.C. § 1721(a) (2003).

 Likewise, the implementing regulation issued by MMS states that "an interest charge shall be assessed on unpaid and underpaid amounts from the date the amounts are due." 30 C.F.R. § 218.54(a) (2002). The imposition of late payment interest charges is intended to compensate the government for the time value of money due to it but not timely paid. *See Meridian Oil, Inc.,* 140 I.B.L.A. 135, 143 (1997). The language of the statute and implementing regulation indicates that the assessment of late payment interest is not discretionary.

ARCO/Vastar argues that "imposition of late payment interest would be inequitable" and urges the Court to relieve it of late payment interest charges as the court did in *Jicarilla Apache Tribe v. Continental Oil Co.,* No. 76–430 (D.N.M. November 21, 1988) ("*Conoco*"). Plaintiff's reliance on the *Concoco* decision is misplaced however because it dealt with the payment of *prejudgment* interest and because the lessees in the case were ultimately required to pay *postjudgment* interest.

In *Conoco,* the court found, in relevant part, that lessees owed additional royalties in an amount to be calculated by the agency within a set time. The court declined to assess *prejudgment* interest at the time of its decision because it was not "appropriate on a debt which is unliquidated and incapable of calculation prior to judgment." *Conoco,* Findings of Fact and Conclusions of Law, May 13, 1998, at 17. Following the *Conoco* decision, the amount of royalties owed by the lessees was calculated and the MMS issued three Orders assessing additional royalties and corresponding late payment interest. The IBLA sustained the assessment of late payment interest on appeal. In its analysis, the IBLA reviewed 30 U.S.C. § 1721(a) and 30 C.F.R. § 218.54(a), and determined that "the court's denial of prejudgment interest [in *Conoco*] does not bar MMS from seek-

---

ties, operational requirements and particularly composition. Although one may classify natural gas into certain categories, such as sweet gas, sour gas, wet gas, dry gas, associated gas or even coalbed gas, each gas occurrence has individual characteristics that differentiate it to some degree from another. In this respect it can be argued that each natural gas is unique in some manner.
*See* RVD Decision at 3–4.
In other words, the real question is not whether coalbed methane gas is atypical (which the Assistant Secretary determined it was), but whether the coalbed methane gas produced by Vastar is atypical or unusual.

ing postjudgment interest on those under-payments ... [i]ndeed, MMS is statutorily required to do so." *Meridian Oil, Inc.,* 140 I.B.L.A. at 144.

As the IBLA observed in *Meridian,* the mandatory nature of the statutory and regulatory language pertaining to the payment of late payment interest speaks for itself, and for that reason, the Court will not set aside the Assistant Secretary's assessment of late payment interest.

### The Amoco Decision Does Not Violate the Statute of Limitations

Amoco argues that the agency is barred from collecting royalties accrued more than six years prior to the May 27, 1997 Order by the statute of limitations set forth in 28 U.S.C. 2415(a):

> [s]ubject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later ....

28 U.S.C. § 2415(a) (1994).

The Assistant Secretary denied Amoco's appeal on this issue stating that the statutory bar was inapplicable because the proceeding was an administrative appeal. *See* Amoco Decision at 21. Her decision was consistent with longstanding I.B.L.A. precedent. *See Foote Mineral Co.,* 34 I.B.L.A. 285, 306–308 (1978); *Anadarko Petroleum Corp.,* 122 I.B.L.A. 141, 148 (1992) (holding that § 2415(a) does not apply to administrative proceedings); *Meridian Oil, Inc.,* 140 I.B.L.A. 135, 145 (1997) (stating that "we have long ruled that statutes estab-

lishing time limitations for the commencement of judicial actions for damages on behalf of the United States do not limit administrative proceedings within the DOI").

In 1996, Congress amended FOGRMA by enacting a seven year statute of limitations on lease-related demands, specifically "a judicial proceeding or demand which arises from, or relates to an obligation, shall be commenced within seven years from the date on which the obligation becomes due and if not so commenced shall be barred." 30 U.S.C. § 1724(b)(1) (2003). The amendment explicitly precludes the application of the statute of limitations set forth in 28 U.S.C. § 2415 to any obligation arising under FOGRMA. 30 U.S.C. § 1724(b)(3). Unfortunately, the provisions of the amended statute do not control this case because it relates to gas produced between January 1989 and August 1996; the seven year statute of limitations of § 1724(b)(1) applies only to oil and gas production occurring after its effective date of September 1, 1996. As a result, the Court must determine whether 28 U.S.C. 2415(a) bars the agency from collecting royalties due more than six years prior to the May 27, 1997 MMS Order.

The Court's inquiry must begin with the language of the statute itself. *Butler v. West,* 164 F.3d 634, 639 (D.C.Cir.1999). In addition, the United States Supreme Court has held that "statutes of limitation sought to be applied to bar rights of the Government ... must receive a strict construction in favor of the Government." *Badaracco v. Comm'r of Internal Revenue,* 464 U.S. 386, 391, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) (quoting *E.I. Dupont De Nemours & Co. v. Davis,* 264 U.S. 456, 462, 44 S.Ct. 364, 68 L.Ed. 788 (1924)). Complicating matters is the existence of a circuit split as

to whether 28 U.S.C. § 2415(a) applies to MMS orders to collect additional royalties.

Plaintiffs rely primarily upon a relatively recent en banc decision in which the 10th Circuit held that 28 U.S.C. § 2415(a) barred an MMS order directing lessees to pay additional royalties on production produced before September 1, 1996. *OXY USA, Inc. v. Babbitt,* 268 F.3d 1001 (10th Cir.2001) ("*OXY USA II*").[9] *OXY USA II* stemmed from a December 1996 order issued by MMS directing lessees to pay additional royalties for oil produced from federal leases between January 1980 and September 1983. *OXY USA II,* 268 F.3d at 1003–1004. Lessees filed suit in district court seeking a declaration that the claim for royalties was time barred by 28 U.S.C. § 2415(a). *See id.* The district court, relying on language in *Phillips Petroleum Co. v. Lujan,* 4 F.3d 858, 860 & n. 1 (10th Cir.1993), determined that § 2415(a) barred the MMS order and granted summary judgment in favor of lessees.[10] *See id.* On appeal, a divided panel of the 10th Circuit Court of Appeals reversed, holding that § 2415(a) was inapplicable because MMS orders are not "actions" as contemplated by the statute. *OXY USA, Inc. v. Babbitt,* 230 F.3d 1178, 185–90 (10th Cir. 2000) ("*OXY USA I*").

The 10th Circuit granted a Petition for Rehearing and after a methodical analysis, concluded that "the statutory language, together with a forthright statutory scheme and purpose, clearly instruct that the six year statute of limitation[s] under 28 U.S.C. § 2415(a) applies to the MMS orders in this case." *OXY USA II,* 268 F.3d

at 1005. Upon concluding that the statutory time bar of 28 U.S.C. § 2415(a) applied, the 10th Circuit vacated *OXY USA I* and affirmed the district court's order granting summary judgment to the lessees. *See id.* at 1008.

In the en banc decision, the 10th Circuit first considered the phrase "every action" in § 2415(a) and found it to be "patently broad" and ultimately inclusive of administrative collection proceedings such as the MMS order at issue. *Id.* at 1005. The statute's subsequent reference to a "complaint" did not limit its application to formalized judicial proceedings, the 10th Circuit stated, in light of "the statute's obvious purpose to level the playing field between the government and private litigants by forcing the government to promptly assert its claims [and a] reading of the entire text of § 2415, including subsections (f) and (i)." *Id.* Subsection (f) allows the United States to assert, in an action against it, a counter claim or offset against a party under certain conditions. 28 U.S.C. § 2415(f). Subsection (i) permits the United States to collect a claim by means of administrative offset. 28 U.S.C. § 2415(i). The 10th Circuit found these provisions demonstrative of Congressional intent for " § 2415(a) to encompass more than the filing of a 'complaint' in court." *Id.* at 1006.

Notwithstanding lessees' statutory obligation to make royalty payments on production from federal leases, the 10th Circuit concluded that the MMS royalty collection order was founded on contract.

---

9. Plaintiffs additionally cite a decision by the United States District Court for the District of Alaska which applied § 2415(a) to an MMS order seeking additional royalties because it found such efforts "more analogous to actions at law for damages than to actions in equity for restitution." *Marathon Oil Co. v. Babbitt,* 938 F.Supp. 575, 578 (D.Alaska 1996).

10. The court in *Phillips Petroleum v. Lujan* accepted without discussion the parties' agreement that 28 U.S.C. § 2415(a) applied to the government's effort to collect royalty underpayment and agreed with the parties that the oil and gas leases at issue were contracts. *Phillips Petroleum v. Lujan,* 4 F.3d at 860.

*See id.* at 1007. The Circuit next rejected the distinction recognized by the 5th Circuit in an unpublished decision between "contractual obligations," i.e., royalties due on production, and money damages, finding that it too narrowly construed the phrase "money damages." *See id.* at 1007–1008 (referring to the 5th Circuit's decision in *Phillips Petroleum Co. v. Johnson,* 1994 WL 484506 (5th Cir.) (*"Phillips Petroleum"*)). The Circuit stated that *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), upon which the 5th Circuit relied in *Phillips Petroleum,* was "neither binding nor persuasive" and held that the MMS order was an action for money damages because it was "substantively indistinguishable from other government claims to recover money owed under contracts governed by the limitations period in § 2415(a)." *Id.*

Finally, the 10th Circuit determined that FOGRMA's seven year statute of limitations did not trigger the "except as otherwise provided by Congress" exception of 28 U.S.C. § 2415 "because [the FOGRMA limitation] applied only to oil and gas production occurring after its effective date of September 1, 1996." *Id.* at 1009. The 10th Circuit further reasoned that Congress would not have amended FOGRMA to include a statute of limitations if it believed that the provisions therein and the enacting regulatory scheme otherwise superceded 28 U.S.C. § 2415(a). *See id.*

Defendants argue that § 2415(a) cannot apply to this case because it is not a complaint or action brought by the United States for money damages. Defendants refer to the unpublished 5th Circuit decision in *Phillips Petroleum* holding that § 2415(a) did not apply to an MMS order to collect additional royalties because "actions that don't involve the filing of a complaint are not 'action[s] for money dam-

ages'" as contemplated by the statute. *Phillips Petroleum,* 1994 WL 484506, *1. In addition, as mentioned above, the 5th Circuit noted in *Phillips Petroleum* the distinction between "money damages," which generally refers to a sum of money used as compensatory relief, and the contractual obligations sought by the MMS, and held that "[s]uch contractual obligations cannot be considered compensatory." *Id.* (citing *Bowen v. Massachusetts,* 487 U.S. 879, 897, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988)).

More persuasively however, Defendants also rely upon a decision by the United States District Court for the District of Columbia, which held that the limitation of § 2415(a) did not act as a time bar to an MMS order to collect additional royalties and associated interest. *Samedan Oil Corp. v. Deer,* 1995 WL 431307 (D.D.C.) *rev'd on other grounds, IPAA v. Babbitt,* 92 F.3d 1248, 1260 (D.C.Cir.) ("[b]ecause we conclude that DOI cannot collect any royalties on the settlement payment, it is unnecessary for us to consider appellant Samedan's statute of limitations claim"). At issue in *Samedan* was a December 1993 MMS order directing the lessee to pay royalties due on production produced between February 1988 and November 1989. *Samedan* at *1. In October 1994, after the agency affirmed the order, the lessee filed suit in court seeking to enjoin the order. *See id.* The government filed a counterclaim to enforce the order in November 1994. *See id.* The lessee argued in *Samedan* that the six year statute of limitations of § 2415(a) barred the collection of royalties due prior to October 31, 1988 because the "complaint" to enforce an "action for money damages," i.e., the MMS order, was the government's November 1994 counterclaim. *See id.* at *3. As in this case, the government argued that § 2415(a) did not apply.

The district court first decided that the lease, while it referred to and incorporated certain statutes and regulations, was founded on contract as evidenced by numerous contractual provisions such as the lease term, royalty rate, timing and frequency of payments, and record-keeping and reporting requirements. *See id.* at *4–5. Though separately the terms were not determinative of the existence of a contract, together the district court found that they "are integral to an interpretation of the lease [and] are beyond mere backdrop for an incorporated statute ... the statute and the regulations play an interstitial role in an otherwise self-contained document." *Id.* at *5.

The district court next agreed with the government's position that the additional royalties sought by the MMS were "not money damages because they are not compensatory, but rather something to which the government is already entitled under the terms of the lease." *See id.* at *5. Looking to the 5th Circuit's decision in *Phillips Petroleum* and the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. at 893, 108 S.Ct. 2722 (stating that "the fact that a judicial remedy may require one party to pay money damages to another is not sufficient reason to characterize the relief as 'money damages' "), the court held that § 2415(a) was inapplicable because "DOI's claim is not to recover damages; it is to collect royalties payable under the terms of the Samedan lease." *Id.* at *6.

The district court next turned to the term "action" as used by the statute in the phrase "action for money damages." The lessee in *Samedan* urged the district court to extend the term "action" to include administrative proceedings. *Samedan* at *7. The district court found the 5th Circuit's opinion in *Phillips Petroleum* controlling

and declined the lessee's invitation, reasoning that:

[o]nly if "action" includes administrative proceedings but "complaint" is confined to judicial pleadings, might Samedan prevail. That construction, however, violates the sense of the statute. Section 2415(a) states that "every action for money damages ... shall be barred unless the complaint is filed within six years ...." Use of the definite article 'the' to modify 'complaint'-instead of the indefinite article 'a'-tells us that a particularized 'complaint' has been previously specified by context ... it is clear that the antecedent of 'complaint' is 'action.'

*Id.*

The district court therefore held that "action" as used in § 2415(a) applied to "judicial but not to administrative proceedings," and that the judicial action before the court (i.e., the government's counterclaim for summary judgment to enforce the administrative order) was an action to enforce an administrative order, not to collect money damages. *Id.* at *7–9.

To summarize, although the MMS order was based on contract, the United States District Court for the District of Columbia held in *Samedan* that § 2415(a) was no bar to the MMS order because the government was not pursuing "money damages" and because the government's claim was not an "action" as those terms are used in the statute. *See also, Vastar Resources, Inc. v. Armstrong*, No. 94–02040 (D.D.C. Aug, 27, 1997); *but see, Fina Oil & Chemical Co. v. Norton*, 209 F.Supp.2d 246, 257 (D.D.C.2002) (finding that the six year statute of limitations under § 2415(a) applied, but holding that it did not bar the action before the court because it was brought by the lessee) *rev'd on other grounds, Fina Oil & Chemical Co. v. Norton*, 332 F.3d 672 (2003).

The Court finds the logic underpinning the district court's decision in *Samedan* persuasive. Therefore, upon review of the statute and consideration of the facts of this case, the Court holds that § 2415(a) does not bar the collection of royalties due six years prior to the May 27, 1996 MMS Order in this case for the following reasons. First, as in *OXY USA II* and *Samedan,* the royalty claims at issue in this case arise from the lease, i.e., a contract. Nevertheless, the MMS Orders which Plaintiffs appeal do not seek money damages, but rather claim royalties due under the lease. *Samedan* at *6. Furthermore, the relationship between "action" and "complaint" in the statute indicates that the statute applies to judicial proceedings, not administrative orders. *Samedan* at *7. Finally, the statute plainly bars "every action for money damages *brought by the United States.*" The action currently before the court was not brought by the United States, it is an appeal of administrative orders brought by Plaintiffs pursuant to the Administrative Procedure Act and other statutes. Moreover, unlike the circumstances in *Samedan,* the government has not filed a counterclaim to enforce the May 1997 Order. Therefore, Amoco's Motion for Summary Judgment is denied with respect to this issue.

## CONCLUSION

For the reasons set forth herein, in an accompanying Order, the Court will deny the Plaintiffs' Motions for Summary Judgments and grant the Defendants' Motion for Summary Judgment.